**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 18-cv-00605-NYW

CYNTHIA SZYMANSKI,

      Plaintiff,

v.

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

      Defendant.

---

## MEMORANDUM OPINION AND ORDER

---

Magistrate Judge Nina Y. Wang

      This civil action arises under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401–33 for review of the Commissioner of Social Security Administration's ("Commissioner" or "Defendant") final decision denying Plaintiff Cynthia Szymanksi's ("Plaintiff" or "Ms. Szymanski") application for Disability Insurance Benefits ("DIB"). Pursuant to the Parties' consent [#11], this civil action was referred to this Magistrate Judge for a decision on the merits. *See* [#17]; 28 U.S.C. § 636(c); Fed. R. Civ. P. 73; D.C.COLO.LCivR 72.2. Upon review of the Parties' briefing, the entire case file, the Administrative Record, and the applicable case law, this court respectfully **REVERSES** the Commissioner's decision and **REMANDS** for further proceedings.

## BACKGROUND

### I.    Medical History

      Ms. Szymanksi, born January 15, 1957, alleges she became disabled on January 2, 2015, due to bipolar disorder; she was 57 years-old on the date of alleged onset of her claimed disability.

*See* [#9-3 at 90,[1] 92; #9-6 at 181, 185]. In 1988, Plaintiff suffered her first major depressive episode, lasting approximately three months, which left Ms. Szymanski feeling depressed most days with a lack of feeling pleasure, energy, or desire to leave her house. *See* [#9-7 at 278, 302-03, 305]. Plaintiff suffered a second major depressive episode in 1993. *See* [*id.* at 278]. Doctors treated both episodes with Prozac, but Plaintiff experienced hypomania and mood destabilization not soon after starting Prozac. *See* [*id.*]. Dr. Ken Weiner then diagnosed Plaintiff with bipolar disorder in 1994; Dr. Weiner again prescribed Prozac, which had similar negative effects, but later prescribed Lithium that helped stabilize Plaintiff's mood with some negative side effects. *See* [*id.* at 278, 304, 306]. Plaintiff constantly dealt with "serious ups and downs" while hypomanic, including severe fluctuations in impulse control, anxiety, psychotic thoughts, suicidal ideations, depression, insomnia, and energy. *See* [*id.* at 278-79, 303-04].

On May 30, 1996, Plaintiff presented to Dr. Steven L. Dubovsky for a psychiatric evaluation. *See* [#9-7 at 278]. Dr. Dubovsky noted that Ms. Szymanski's depression "has been accompanied by hypersomnia, slowed thinking, problems with memory and concentration, dissociative symptoms, loss of interest in food[,] and suicidal thoughts." [*Id.* at 278-79]. Dr. Dubovsky continued that Plaintiff "probably had chronically elevated levels of mood, energy and activity," but no significant decrease in need for sleep while taking antidepressants; that Plaintiff was "irritable and impatient when her mood [was] elevated but not when her mood is depressed"; that Plaintiff had "chronically racing thoughts during periods of elevated mood but her thinking [was] always slowed when she fe[lt] depressed"; and that Plaintiff sometimes heard her named

---

[1] When citing to the Administrative Record, the court utilizes the docket number assigned by the CM/ECF system and the page number associated with the Administrative Record, found in the bottom right-hand corner of the page. For all other documents the court cites to the document and page number generated by the CM/ECF system.

called and saw movement out of the corner of her eye. *See* [*id.* at 279]. Upon examination, Dr. Dubovsky reported that Plaintiff's appearance was "somewhat subdued but [she was] clearly capable of looking much better than she feels", that Plaintiff's speech was "very well organized and perhaps very slight pressured", that Plaintiff's affect seemed "slight depressed", and that Plaintiff's sensorium "appear[ed] intact." [*Id.*]. Dr. Dubovsky opined that Ms. Szymanski was mildly depressed, and explained that Ms. Szymanski had "been so accustomed over the years to an abnormal mood that she [did] not notice minor mood swings" and could appear "well when this is not the case." [*Id.* at 280].

Sometime in 1999, Plaintiff checked herself into the hospital for a mental health hold, where she saw Dr. Ben Green. *See* [#9-2 at 78; #9-7 at 304]. Plaintiff saw Dr. Green quarterly between 1999 and 2006, and Dr. Green prescribed Tegretol, Zoloft, and Klonopin, which "worked ok" and were "tolerable." [*Id.*]. Plaintiff eventually weaned herself from these medications and, in 2000, became pregnant with her daughter—a time she "felt the best mentally." [*Id.* at 304-05]. Plaintiff managed her bipolar well between 2006 and 2015. *See* [*id.* at 282, 306].

Plaintiff began treating with Dr. Morel Laronn on July 14, 2014. *See* [#9-7 at 272]. Plaintiff saw Dr. Laronn twice, once on July 14, 2014 and again on May 15, 2015. *See* [*id.* at 270-73]. Dr. Laronn noted Plaintiff's treatment history for bipolar disorder, among other ailments, assessed mild depression and generalized anxiety disorder upon psychiatric evaluation, and prescribed Lexapro for Ms. Szymanski's anxiety. *See* [*id.*].

On October 26, 2015, Plaintiff presented to Dr. Moles and reported that "several challenging things happen[ed] to her in the last year", including losing her house and her husband's treatment for amyloidosis, and that she had "lost interest in things she used to do for fun" and was struggling with anxiety and depression. [#9-7 at 274]. A physical exam revealed that Plaintiff

was alert and oriented, could move all extremities, and had a normal affect. [*Id.* at 275]. Dr. Moles completed a Physical Residual Functional Capacity Questionnaire for Plaintiff, in which Dr. Moles indicated that while Plaintiff had no physical impairments, her psychological impairments rendered her incapable of performing low stress jobs. [*Id.* at 283-86].

Plaintiff completed a Function Report on November 8, 2015. She stated that her mental impairment limited her ability to work because she "won't leave [the] house," she has a "lack of concentration, focus, confidence or worth," and struggles with "extreme fatigue, tearfulness & fear, no motivation, [and] memory problems." [#9-6 at 199]. She continued that she can work for only short periods before her symptoms "reappear," and that she has severe issues with focus and concentration. *See* [*id.* at 199, 203-06]. As for her daily activities, Plaintiff reported that she stays indoors for most of the day but picks up and drops off her daughter, drives daily, that she cares for her husband and her daughter, that she does some cooking, that her husband does most of the housework, that she shops and handles finances, and that she has no issues with personal hygiene. *See* [*id.* at 200-03]. Plaintiff's husband provided a third-party Function Report that largely mirrors Ms. Szymanski's allegations. *See* [*id.* at 210-17].

On November 9, 2015, state agency psychological consultant Mark Suyeishi, Psy.D. reviewed Plaintiff's medical records. Dr. Suyeishi found a severe mental impairment of anxiety disorders, but noted that there was insufficient evidence to evaluate this impairment because Plaintiff had not responded with requested additional documentation. *See* [#9-3 at 92-93].

In 2016, Plaintiff began treating with psychiatrist Dr. Randall Buzan because she wanted "to have a more steady mood." [#9-7 at 301 (stating Plaintiff complained of not knowing "if it [is] going to be a good day or a bad day.")]. On April 7, 2016, Dr. Buzan noted that Plaintiff was "delightful, funning [sic], fidgety and bounced leg most of the time," sarcastic with a great sense

4

of humor, and that Plaintiff reported that she felt good with her depression a 3/10.  *See* [*id.* at 309].

Dr. Buzan reported that Plaintiff was "very bright and delightful" with bipolar I disorder, depression, and ADHD-type temperament, but was euthymic.  *See* [*id.*].[2]  But treatment notes from April 18, 2016 indicate that Plaintiff presented crying and looking exhausted and sad, and that Plaintiff reported feeling "really depressed at this point", but that she was "not suicidal" just "quite bored with life—no plan," and that she denied hypomania and mania.  *See* [*id.* at 300, 309].

Treatment notes from May 4, 2016 indicate that Ms. Szymanski presented on time and looked more alert and focused with no tics or agitation, and that she reported that she felt good but scattered, that she had no suicidal ideation, that her mood was up and down lately but better for the most part, that she felt overcaffeinated, and that she "fe[lt] clearly improved on the meds so far."  [*Id.* at 300, 309-10].

Dr. Buzan's June 14, 2016 Psychiatric Evaluation noted Plaintiff's symptoms as sadness, anxiety, lethargy, hopelessness, lack of motivation, not leaving the house, paranoia, isolation, inability to concentrate or work, and agitation.  [#9-7 at 305].  A review of Plaintiff's psychiatric symptoms indicated that Plaintiff was positive for major depression, bipolar I disorder, panic disorder with recent panic attacks and anxiety, agoraphobia, general anxiety disorder, and social phobia.  *See* [*id.* at 307].  Upon examination, Dr. Buzan noted that Plaintiff was euthymic, thoughtful, well-kept, logical, and coherent.  [*Id.* at 309].

Dr. Buzan's treatment notes from September 19, 2016 indicate that Ms. Szymanski presented on time, was pleasant, articulate, oriented, logical, coherent, euthymic, maintained good eye contact, and had no suicidal ideation.  *See* [#9-7 at 316].  Dr. Buzan reported that Plaintiff was

---

[2] All of Dr. Buzan's treatment notes contain this same assessment.

"doing very well" psychiatrically and "doing very great" psychiatrically despite some neurological symptoms. *See* [*id.* at 317].

On September 30, 2016, Ms. Szymanski presented to Dr. Ralph Round, per a referral from Dr. Buzan, to follow-up on Plaintiff's neurological symptoms. *See* [*id.* at 288-99]. Dr. Round's physical exam revealed that Plaintiff was alert and oriented with intact memory, a good amount of spontaneous speech, a broad fund of knowledge, and normal sensation and reflexes; Dr. Round suspected benign fasciculation syndrome. *See* [*id.* at 289-90].

Plaintiff returned to Dr. Buzan on January 18, 2017, and reported that she thought she "was ok", that her neurological testing came back normal, that she believed Ritalin was the cause of her neurological issues, and that she felt irritable and sad and like she was cycling a bit when not on Ritalin. *See* [#9-7 at 322-24]. Dr. Buzan indicated that Plaintiff was contracting for safety and denied current suicidal ideation (with some in the past), and Dr. Buzan requested that Plaintiff email him twice per week. *See* [*id.* at 324].

Dr. Buzan's February 22, 2017 treatment notes reveal that Plaintiff presented sobbing, sad, depressed; tossed a pill bottle at Dr. Buzan while exclaiming "this is not working anymore!"; had passive suicidal ideation; and was too depressed to contact Dr. Buzan for medication suggestions. *See* [*id.* at 331-32]. Dr. Buzan implored Plaintiff to "stay in closer touch" for safety reasons. [*Id.* at 332].

Ms. Szymanski had a follow-up appointment with Dr. Buzan on March 14, 2017. [#9-7 at 341]. Dr. Buzan noted that Plaintiff emailed often and called because she was "feeling so depressed", and that Ms. Szymanksi stated that her mood was "ok, better than it was", that her irritability was better, that she felt it was "too much effort to go out [or] engage", that she was not exercising, and that she really had to work to "have any kind of affect[.]" [*Id.* at 347]. In addition

to adjusting Ms. Szymanski's medications, Dr. Buzan indicated that Plaintiff struggled with "persisting severe depression" that improved on lithium and Zoloft, and directed Plaintiff to text, email, or call often to discuss how she was feeling. *See* [*id.* at 348-49].

On May 4, 2017, Dr. Buzan provided two Medical Source Statements. Dr. Buzan assessed Ms. Szymanski's mental impairments as having a significant impact on her functionality. *See* [#9-7 at 355-67].

## II.     Procedural History

On August 14, 2015, Plaintiff protectively filed an application for DIB. [#9-3 at 149]. The Social Security Administration denied Plaintiff's application administratively on November 9, 2015. *See* [*id.* at 89]. Ms. Szymanski requested a hearing before an Administrative Law Judge ("ALJ"), *see* [#9-4 at 104-118], which ALJ Thomas Inman ("the ALJ") held on May 11, 2017, *see* [#9-2 at 58]. The ALJ received testimony from the Plaintiff and Vocational Expert Martin Rauer (the "VE") at the hearing. *See* [*id.* at 36-91].

Plaintiff testified that she obtained a Bachelor of Arts degrees in English Literature and developmental cognitive neuroscience and a Master's Degree in theology; she was also the Chief Executive Officer of a successful free-range egg business. *See* [#9-2 at 62]. She then testified that her depression caused a "decrease of cognitive function[ing] and memory", a "lack of resilience", irritability, an inability to get out of bed or the house for days, suicidal ideation about 75% of the time, and a sense that "[i]f anything goes wrong, everything's a disaster." [#9-2 at 67-68]. She explained that her depressive episodes can range from two weeks to 18 months in duration. *See* [*id.* at 70]. Plaintiff also testified to manic or hypomanic episodes, which manifested in manic episodes of shopping, going on trips, reckless behavior, reckless sexual behavior, hyperirritability, and grandiose ideas. *See* [*id.* at 69-70, 76].

Plaintiff explained that she struggled with depression and bipolar disorder while running her small business; she relied on her employees to help keep the business running during times of depression but could accomplish much more during her manic episodes. *See* [#9-2 at 68-69]. Ms. Szymanksi testified that in the beginning she was able to conceal her illness from outsiders, because it was important to her to be a respected business owner. *See* [*id.* at 73-74]. But as time went on, Plaintiff experienced more depressive and manic episodes, and given the stress of running her own company, Plaintiff sold the company for a profit—while this alleviated some of the stress, she continued to struggle with "depression and despair and . . . not leaving the house." [*Id.* at 69-70]. Ms. Szymanksi stated that for years she tried to work with her primary care physician to manage her bipolar because she "didn't have a lot of respect for psychiatrists." [*Id.* at 77].

After selling her company, Plaintiff worked as a consultant for a company called Vital Farms for three months, between February 8 and May 8, 2015. *See* [#9-2 at 65-66]. Despite Vital Farms wanting Plaintiff to continue her consulting role, Plaintiff could not do so because she "was very overwhelmed by the job", was "cry[ing] every time" she went to work, was "extremely anxious" about people judging her work, "was losing concentration", and was "very depressed." *See* [*id.* at 66, 67]. Ms. Szymanski also testified that she would often leave work for long stretches during the day to collect herself, but that the job soon become too much for her. *See* [*id.* at 74-75]. Now, although Plaintiff desires to return to work, she spends most of her days at home sleeping, isolated in her bedroom because even "an interruption is kind of overwhelming." [*Id.* at 71]. She also explained that she cries often. *See* [*id.* at 73].

Plaintiff continued that she takes Tegretol, Lithium, Klonopin, and Zoloft for her mental ailments. [#9-2 at 72]. Ms. Szymanski testified to medication side effects, including trembling hands, lethargy, weight gain, and decreased cognitive functioning. *See* [*id.*]. She explained that

she cannot concentrate well and has difficulty concentrating enough to finish a book even though she was once an avid reader. [*Id.*]. In addition, Plaintiff stated that her husband takes care of their house and that she cooks three to four times a week, mostly meal kits that provide the ingredients and instructions. *See* [*id.* at 73].

The VE also testified at the hearing. The VE first summarized Plaintiff's past relevant work to include a food product consultant, specific vocational preparation ("SVP")[3] level 6, light exertion job; a small business owner, SVP level 7, light exertion job; and an egg producing farm supervisor, SVP level 7, medium exertion job. *See* [#9-2 at 79]. The VE then considered the work an individual could perform with no exertional limitations but whose non-exertional limitations included simple, routine work at a SVP level 1 or 2, no assembly line work, no contact with the public, and only occasional contact with co-workers and supervisors. *See* [*id.*]. The VE testified that this individual could not perform any of Ms. Szymanski's past relevant work. [*Id.* at 80]. But the VE explained that such an individual could perform the unskilled, light exertion jobs of small products assembler, electronics worker, and machine operator—each a SVP level 2. *See* [*id.*]. The VE continued that such an individual could also perform the unskilled, medium exertion jobs of cleaner II, SVP level 1; floor wax technician, SVP level 2; and hand packager, SVP level 2. *See* [*id.* at 80-81]. Upon further examination, however, the VE corrected his answers to eliminate the small product assembler, electronics worker, machine operator, and hand packager because these

---

[3] SVP refers to the "time required by a typical worker to learn the techniques, acquire the information, and develop the facility needed for average performance in a specific job-worker situation.'" *Vigil v. Colvin*, 805 F.3d 1199, 1201 n.2 (10th Cir. 2015) (citing Dictionary of Occupational Titles, App. C, Sec. II (4th ed., revised 1991)); 1991 WL 688702 (G.P.O.). The higher the SVP level, the longer time is needed to acquire the skills necessary to perform the job. Jeffrey S. Wolfe and Lisa B. Proszek, SOCIAL SECURITY DISABILITY AND THE LEGAL PROFESSION 163 (Fig. 10-8) (2003).

were assembly line jobs, and instead testified that the remaining jobs would be a cleaner II, a floor wax technician, and houseworker (SVP level 2, medium exertion).  *See* [*id.* at 84-85].

The VE also testified that no unskilled jobs existed for a worker that would be off task as much as 20% of the day or who would miss more than one day per month.  *See* [#9-2 at 81].  Upon follow-up from Plaintiff's counsel, the VE stated that even being off task 10% of the day would eliminate all unskilled jobs identified, though some jobs would tolerate being off task 8% of the day but not if the employee expressed rage towards co-workers or managers.  *See* [*id.* at 82-83, 85-86].  The VE concluded that his testimony was not inconsistent with the Dictionary of Occupational Titles ("DOT") and that he relied on his over 30-years of experience to fill areas not covered by the DOT.  *See* [*id.* at 87].

On August 23, 2017, the ALJ issued a decision finding Ms. Szymanski not disabled under the Act.  [#9-2 at 21].  Plaintiff requested Appeals Council review of the ALJ's decision, which the Appeals Council denied, rendering the ALJ's decision the final decision of the Commissioner [*id.* at 1-6].  Plaintiff sought judicial review of the Commissioner's final decision in the United States District Court for the District of Colorado on March 13, 2018, invoking this court's jurisdiction to review the Commissioner's final decision under 42 U.S.C. § 1383(c)(3).

## STANDARD OF REVIEW

In reviewing the Commissioner's final decision, the court is limited to determining whether the decision adheres to applicable legal standards and is supported by substantial evidence in the record as a whole.  *Berna v. Chater*, 101 F.3d 631, 632 (10th Cir. 1996) (citation omitted); *cf. Thompson v. Sullivan,* 987 F.2d 1482, 1487 (10th Cir. 1993) ("[I]f the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence." (internal citation omitted)).  The court may not reverse an ALJ simply because she may have reached a

different result based on the record; the question instead is whether there is substantial evidence showing that the ALJ was justified in her decision. *See Ellison v. Sullivan,* 929 F.2d 534, 536 (10th Cir. 1990). "Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007) (internal citation omitted). But "[e]vidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion." *Musgrave v. Sullivan,* 966 F.2d 1371, 1374 (10th Cir. 1992) (internal citation omitted). The court may not "reweigh the evidence or retry the case," but must "meticulously examine the record as a whole, including anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Flaherty,* 515 F.3d at 1070 (internal citation omitted).

## ANALYSIS

### I. The ALJ's Decision

An individual is eligible for DIB benefits under the Act if she is insured, has not attained retirement age, has filed an application for DIB, and is under a disability as defined in the Act. 42 U.S.C. § 423(a)(1). An individual is determined to be under a disability only if her "physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 423(d)(2)(A). The disabling impairment must last, or be expected to last, for at least 12 consecutive months. *See Barnhart v. Walton*, 535 U.S. 212, 214–15 (2002). Additionally, the claimant must prove she was disabled prior to her date last insured. *Flaherty*, 515 F.3d at 1069.

The Commissioner has developed a five-step evaluation process for determining whether a claimant is disabled under the Act. 20 C.F.R. § 404.1520(a)(4)(v). *See also Williams v. Bowen*, 844 F.2d 748, 750–52 (10th Cir. 1988) (describing the five steps in detail). "If a determination

can be made at any of the steps that a claimant is or is not disabled, evaluation under a subsequent step is not necessary." *Williams*, 844 F.2d at 750. Step one determines whether the claimant is engaged in substantial gainful activity; if so, disability benefits are denied. *Id.* Step two considers "whether the claimant has a medically severe impairment or combination of impairments," as governed by the Secretary's severity regulations. *Id.*; *see also* 20 C.F.R. § 404.1520(e). If the claimant is unable to show that his impairments would have more than a minimal effect on his ability to do basic work activities, he is not eligible for disability benefits. If, however, the claimant presents medical evidence and makes the *de minimis* showing of medical severity, the decision maker proceeds to step three. *Williams*, 844 F.2d at 750. Step three "determines whether the impairment is equivalent to one of a number of listed impairments that the Secretary acknowledges are so severe as to preclude substantial gainful activity," pursuant to 20 C.F.R. § 404.1520(d). *Id.* At step four of the evaluation process, the ALJ must determine a claimant's Residual Functional Capacity ("RFC"), which defines the maximum amount of work the claimant is still "functionally capable of doing on a regular and continuing basis, despite his impairments: the claimant's maximum sustained work capability." *Williams*, 844 F.2d at 751; *see also id.* at 751–52 (explaining the decisionmaker must consider both the claimant's exertional and nonexertional limitations). The ALJ compares the RFC to the claimant's past relevant work to determine whether the claimant can resume such work. *See Barnes v. Colvin*, 614 F. App'x 940, 943 (10th Cir. 2015) (citation omitted). "The claimant bears the burden of proof through step four of the analysis." *Neilson v. Sullivan*, 992 F.2d 1118, 1120 (10th Cir. 1993).

At step five the burden shifts to the Commissioner to show that a claimant can perform work that exists in the national economy, taking into account the claimant's RFC, age, education,

and work experience. *Neilson*, 992 F.2d at 1120. The Commissioner can meet her burden by the testimony of a vocational expert. *Tackett v. Apfel*, 180 F.3d 1094, 1098–99, 1101 (9th Cir. 1999).

The ALJ found that Ms. Szymanski met the insured status requirements for DIB through March 31, 2018, and had not engaged in substantial gainful activity since January 2, 2015. [#9-2 at 12]. At step two the ALJ determined Ms. Szymanski had the following severe impairment: bipolar disorder. [*Id.*]. At step three the ALJ determined that Plaintiff did not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in Title 20, Chapter III, Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d)). [*Id.* at 13]. At step four the ALJ determined Plaintiff had the RFC to perform work at all exertional levels subject to several non-exertional limitations [*id.* at 15], and concluded that Ms. Szymanski could not perform her prior relevant work [*id.* at 19]. At step five the ALJ concluded that there existed additional jobs in the national economy that Ms. Szymanski could perform. [*Id.* at 20].

Ms. Szymanski now appeals the ALJ's decision to this court. In doing so, she argues that the ALJ erred by: (1) not assigning controlling weight to two treating source opinions and by ignoring a third, (2) not considering and evaluating the effect Plaintiff's age may have on her ability to maintain gainful employment, (3) not applying the correct legal standard when evaluating Ms. Szymanski's subjective complaints of impairment, and (4) not applying the correct legal standard at step five. *See generally* [#13; #16]. Because I agree with Ms. Szymanski's first argument, I focus on it exclusively. *Watkins v. Barnhart*, 350 F.3d 1297, 1299 (10th Cir. 2003) ("We will not reach the remaining issues raised by appellant because they may be affected by the ALJ's treatment of this case on remand.").

## II.     The RFC: Weighing the Medical Source Opinions

In assessing a claimant's RFC, the ALJ must consider the combined effect of all medically determinable impairments, including the severe and non-severe.  *See Wells v. Colvin*, 727 F.3d 1061, 1065 (10th Cir. 2013); 20 C.F.R. § 404.1529(a); SSR 96-9p.  The ALJ must also address medical source opinions.  *See Vigil v. Colvin*, 805 F.3d 1199, 1201-02 (10th Cir. 2015).  A claimant's RFC is the most work the claimant can perform, not the least.  20 C.F.R. § 404.1545; SSR 83-10.  The ALJ's RFC assessment must be consistent with the whole record and supported by substantial evidence.  *See generally Howard v. Barnhart*, 379 F.3d 945, 947 (10th Cir. 2004); SSR 96-8p.  If it is, the court will not reverse the ALJ's decision even if it could have reached a different conclusion.  *Ellison*, 929 F.2d at 536; *see also Flaherty*, 515 F.3d at 1070 (explaining that the reviewing court may not "reweigh or retry the case.").

The ALJ determined that Plaintiff retained the RFC to

> perform a full range of work at all exertional levels with the following nonexertional limitations: the claimant is limited to simple, routine work with an SVP of one or two.  She cannot perform jobs that involve assembly-line work, contact with the general public, or more than occasional contact with co-workers and supervisors.

[#9-2 at 21].  Ms. Szymanski challenges the ALJ's RFC determination.  She argues that the ALJ erred by assigning little weight to the opinions of her two treating sources, Drs. Moles and Buzan, and by ignoring a third opinion from Dr. Dubovsky who examined Plaintiff in 1996.  *See* [#13 at 11-12; #16 at 6-8].

The Social Security regulations afford a treating source opinion controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *cf. Garcia v. Colvin*, 219 F. Supp. 3d 1063, 1071 (D. Colo. 2016) ("The distinction between *not*

*inconsistent* and *consistent* is significant. The treating source opinions should not be accorded controlling weight if they contradict other substantial evidence in the record, but they do not necessarily have to reach the exact same conclusions." (emphasis in original)). Generally, the opinion of an examining source is entitled to more weight than the opinion of a non-examining source. *See Garrison v. Colvin*, 759 F.3d 995, 1012 (9th Cir. 2014); 20 C.F.R. § 404.1527(c)(1). Indeed, the opinion of a treating or examining source is in no way "dismissable," *see Chapo v. Astrue*, 682 F.3d 1285, 1291 (10th Cir. 2012), and may be dismissed or discounted only upon an examination of the factors provided in the regulations and "specific, legitimate reasons for rejecting it[,]" *Doyal v. Barnhart*, 331 F.3d 758, 764 (10th Cir. 2003).

But even if the ALJ does not afford the treating source opinion controlling weight, the ALJ owes that opinion deference and must weigh that opinion using all the factors provided in 20 C.F.R. § 404.1527(c)(1)-(6). *See Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003); SSR 96-2p, 1996 WL 374188, at *4. These factors include:

1. the length of the treatment relationship and the frequency of examination;
2. the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed;
3. the degree to which the physician's opinion is supported by relevant evidence;
4. consistency between the opinion and the record as a whole;
5. whether or not the physician is a specialist in the area upon which an opinion is rendered; and
6. other factors brought to the ALJ's attention which tend to support or contradict the opinion.

*Langley v. Barnhart*, 373 F.3d 1116, 1119 (10th Cir. 2004) (quotation marks omitted). Ultimately, the ALJ's findings must be "sufficiently specific to make clear" the weight assigned to the treating source opinion and the reasons for that weight. *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007) (internal quotation marks omitted).

Dr. Moles completed a Physical Residual Functional Capacity Questionnaire on November 16, 2015. Dr. Moles indicated that he had examined Plaintiff twice per year since 2014, and noted Plaintiff's diagnoses as depression and anxiety, her prognosis as fair, and her symptoms as depression, anxiety, and anhedonia. [#9-7 at 283]. Dr. Moles continued that Plaintiff presented with a depressed mood and affect; that her impairments lasted or could be expected to last at least 12 months; that Plaintiff was not a malingerer; that Plaintiff's emotional factors and psychological conditions of depression and anxiety affect her functioning and physical condition; and that Plaintiff's impairments were reasonably consistent with her symptoms and functional limitations. *See* [*id.* at 283-84]. Although Dr. Moles opined that Ms. Szymanski did not have any physical impairments, Dr. Moles opined that her psychological impairments constantly (more than 66% of an eight-hour workday) interfered with her attention and concentration and rendered her incapable of performing even low stress jobs. *See* [*id.* at 284-86].

The ALJ afforded little weight to Dr. Moles's opinion. The ALJ explained that Dr. Moles rendered this opinion "in 2015 and d[id] not consider the substantial medical evidence of record", specifically, Plaintiff's "treatment records with Dr. Buzan", was "substantially unexplained, preventing the [ALJ] from assessing Dr. Moles's reasons behind his statements", and was inconsistent with the medical record. *See* [#9-2 at 18].

On May 4, 2017, Dr. Buzan provided two medical source opinions. First, Dr. Buzan completed a Medical Source Statement of Ability to Do Work-Related Activities (Mental) provided by the Social Security Administration. *See* [#9-7 at 351]. Dr. Buzan indicated that Plaintiff's mental impairment impacted her ability to understand, remember, and carry out instructions. *See* [*id.*]. Dr. Buzan assessed no limitations in carrying out simple instructions and making judgments on simple work-related decisions; mild limitations in understanding and

remembering simple instructions; and marked limitations in understanding and remembering complex instructions, carrying out complex instructions, and making judgments on complex work-related decisions. *See* [*id.*]. Dr. Buzan also noted that Plaintiff's mental impairment impacted her ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in routine work setting. *See* [*id.* at 352]. Based on Plaintiff's exhaustion and severe depression, Dr. Buzan assessed moderate limitations in interacting appropriately with the public as well as marked limitations in interacting appropriately with supervisors, co-workers, and responding appropriately to usual work situations and to changes in a routine work setting. *See* [*id.*]. Further, based on Plaintiff's bipolar disorder, depression, and ADHD combined type, Dr. Buzan noted that Plaintiff's mood is inconsistent and varies such that when it is normal or hypomanic she is functional but that for the most part she is depressed, which affects her other capabilities. *See* [*id.*].

In his second opinion, a Mental Medical Source Statement, Dr. Buzan indicated that he examines Plaintiff once per month or sometimes every two weeks, and reported Plaintiff's DSM-IV evaluation to include bipolar disorder, depression, ADHD combined type, severe family stressors given her husband's illness, and Global Assessment of Functioning[4] scores between 45-50. *See* [#9-7 at 355]. Dr. Buzan further noted that Plaintiff experienced medication side effects of "severe weakness that was so bad . . . [Dr. Buzan] sent her to [a] neuro[logist] for [an]

---

[4] The Global Assessment of Functioning ("GAF") is a scale that assigns a score to reflect an individual's psychological, social, and occupational functioning. The scale is from 0 to 100, with a higher score indicating a higher level of functioning. A GAF score between 45-50 indicates "[s]erious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job." Am. Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) at 34 (4th ed. Text Revision 2000). The current Diagnostic and Statistical Manual of Mental Disorders (DSM-V) does not use GAF. Am. Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders (DSM-V) at 16 (5th ed. 2013).

ALS evaluation." [*Id.*]. As for clinical findings, Dr. Buzan reported that Plaintiff was "depressed" and "articulate," and had "poor stamina" and "suicidal ideation." [*Id.*]. Dr. Buzan then identified a myriad of symptoms Ms. Szymanski exhibited, many of which Dr. Buzan noted in his treatment notes. *See* [*id.* at 356]. Moreover, concerning Plaintiff's mental abilities to perform unskilled work, Dr. Buzan opined that Plaintiff's ability to remember work-like procedures was seriously limited; that her abilities to maintain regular attendance and be punctual within customary, usually strict tolerances, to sustain an ordinary routine without special supervision, and to work in coordination with or proximity to others without being unduly distracted were unable to meet competitive standards; and that her abilities to complete a normal workday and workweek without interruption from psychologically based symptoms, to perform at a consistent pace without an unreasonable number and length of rest periods, and to deal with normal work stress[5] were not useful enough to function. *See* [*id.* at 357]. Dr. Buzan also opined that Plaintiff was unable to meet competitive standards in her ability to interact with the public, and had no useful ability to maintain socially appropriate behavior. *See* [*id.* at 358]. Finally, Dr. Buzan concluded that Plaintiff would miss more than four days per month because of her mental impairment, and that Plaintiff's impairments are reasonably consistent with her symptoms and functional limitations. *See* [*id.* at 359].

The ALJ afforded Dr. Buzan's opinions little weight for several reasons. First, the ALJ found Dr. Buzan's statements not consistent with his own treatment notes, namely, those that noted Plaintiff as thoughtful, euthymic, articulate, logical, coherent, and "very bright and delightful." *See* [#9-2 at 18]. Second, the ALJ found that Dr. Buzan failed to explain his opinions, and did not

---

[5] Indeed, Dr. Buzan noted several work-related demands that Ms. Szymanski would find stressful. *See* [#9-7 at 359].

"draw[] a robust connection between [his] conclusions" and the medical record. *See* [*id.* at 18]. Third, the ALJ found Dr. Buzan's opinions not consistent with Plaintiff's admitted functionality, specifically, driving a car daily, and were not consistent with Plaintiff's admission that she gets along with authority figures especially well. *See* [*id.* at 19]. Finally, the ALJ found Dr. Buzan's opinions not consistent with Dr. Moles's observation that Plaintiff exhibited a normal affect or Dr. Round's observation that Plaintiff produced a good amount of spontaneous speech. *See* [*id.*].

Plaintiff argues that the ALJ erred in affording Drs. Moles and Buzan's opinions little weight. She contends that the ALJ reached this conclusion because Dr. Buzan noted on several occasions that Plaintiff "was a pleasant[,] attractive woman" and because Plaintiff "occasionally drove a car and occasionally functioned at household tasks." [#13 at 15-16]. She further avers that the ALJ merely cherry-picked evidence that supported a finding of not disabled, including ignoring Dr. Dubovsky's 1996 opinion, ignoring Dr. Buzan's repeated notations of Plaintiff's signs and symptoms, and relying on a state agency opinion that did not render a finding as to the effect Ms. Szymanski's mental impairment had on her ability to function. *See* [#16 at 11-12]. The Commissioner responds that the ALJ adequately explained his reasons for affording little weight to Drs. Moles and Buzan's opinions, and that the ALJ was not required to consider Dr. Dubovsky's 1996 opinion. *See* [#15 at 9-13]. While the court agrees that the ALJ provided reasons for discrediting the treating source opinions, I conclude that substantial evidence does not support those reasons.

At bottom, the court agrees with Ms. Szymanski that the ALJ essentially relied on evidence suggesting a finding of not disabled without discussing the medical evidence supporting a finding of disabled. It is axiomatic that an ALJ must discuss the evidence supporting his decision, "the uncontroverted evidence he chooses not to rely upon, as well as significantly probative evidence

he rejects." *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996). This is especially true when weighing medical source opinions. Indeed, an ALJ "'is not entitled to pick and choose through an uncontradicted medical opinion, taking only the parts that are favorable to a finding of nondisability.'" *Chapo v. Astrue*, 682 F.3d 1285, 1292 (10th Cir. 2012) (quoting *Haga v. Astrue*, 482 F.3d 1205, 1208 (10th Cir. 2007)).

Noticeably absent from the ALJ's decision is any discussion of the medical evidence that supported Plaintiff's symptoms and impairments. Indeed, there are several reports in Dr. Buzan's treatment records, which the ALJ relied on significantly, that Plaintiff struggled with her bipolar disorder. For instance, Plaintiff presented crying and looking exhausted on April 18, 2016, and reported feeling "really depressed at this point." [#9-7 at 300, 309]. On January 18, 2017, Plaintiff reported that she felt irritable and sad, and Dr. Buzan noted that Plaintiff was contracting for safety. *See* [*id.* at 322-24]. Dr. Buzan's February 22, 2017 treatment notes reveal that Plaintiff presented sobbing, sad, depressed; tossed a pill bottle at Dr. Buzan while exclaiming "this is not working anymore!"; had passive suicidal ideation; and was too depressed to contact Dr. Buzan for medication suggestions. *See* [*id.* at 331-32]. Similarly, on March 14, 2017, Dr. Buzan noted that Plaintiff emailed often and called because she was "feeling so depressed", that her irritability was better, that she felt it was "too much effort to go out [or] engage", that she was not exercising, and that she really had to work to "have any kind of affect[.]" [*Id.* at 347]. Dr. Buzan also indicated that Plaintiff struggled with "persisting severe depression." [*Id.* at 348].

The ALJ also places great emphasis on Dr. Buzan's notation that Plaintiff was "very bright and delightful," but this appears appended to all of Dr. Buzan's treatment notes and it is far from clear that this assessment accurately reflected Plaintiff's mental state from visit-to-visit. Further, consistent with Dr. Buzan's opinions, the ALJ limited Plaintiff to simple, routine work that did not

involve contact with the public or more than occasional contact with co-workers and supervisors. *Compare* [#9-2 at 15] *with* [#9-7 at 351-52, 357-58]. But the ALJ fails to explain why these portions of Dr. Buzan's opinions would appear credible while the rest were not. Although the ALJ has the sole responsibility of resolving conflicts within the medical record, *see Allman v. Colvin*, 813 F.3d 1326, 1333 (10th Cir. 2016), the ALJ cannot simply ignore evidence that does not support his decision, *see Robinson v. Barnhart*, 366 F.3d 1078, 1083 (10th Cir. 2004).

In addition, while the ALJ was correct that Dr. Moles did not consider Plaintiff's treatment with Dr. Buzan, which Dr. Moles could not have done before issuing his 2015 opinion, the court's review of the medical record does not necessarily support the ALJ's conclusion that Dr. Moles's opinion was not consistent with Dr. Buzan's records. *Cf. Bryant v. Comm'r, SSA*, --- F. App'x ----, 2018 WL 6133387, at *3 (10th Cir. Nov. 23, 2018) (holding that the ALJ impermissibly cherry-picked evidence when the ALJ "focused on the portions of Dr. Bank's notes that arguably undermined Dr. Khalid's opinions but ignored other findings that were consistent with Dr. Khalid's observations."). Indeed, Drs. Moles and Buzan's opinions reflect a similar degree of limitations, *compare* [#9-7 at 283-87] *with* [*id.* at 351-60]—limitations that are uncontradicted by any other medical opinion as Dr. Suyeishi did not provide an opinion as to Plaintiff's functional limitations. *See Chapo*, 682 F.3d at 1291 ("Again, it is important to keep in mind that Dr. Vega's detailed findings are not opposed by those of any other medical source . . . . [T]he ALJ's treatment of Dr. Vega's unopposed mental RFC findings was erroneous"); *cf. Rael v. Berryhill*, 678 F. App'x 690, 694-95 (10th Cir. 2017) (finding no error where the ALJ explained his rationale for weighing treating source opinions that *were* contradicted by other medial opinions).

Further, the court agrees with Ms. Szymanski that the opinion of Dr. Dubovsky, an examining source, provides longitudinal support for her alleged symptoms and impairment, and is

generally consistent with the record. *See Winfrey v. Chater*, 92 F.3d 1017, 1022 (10th Cir. 1996) (noting that an examining-source is entitled to more weight than non-examining sources). Even though Dr. Dubovsky's opinion pre-dates Ms. Szymanski's alleged onset date, it is nonetheless relevant to a claim of disability and should be considered. *See Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004).

Finally, the court expresses some concern over the ALJ's reliance on the perceived "lack of records" to support his disregard for more extreme mental limitations. *See* [#9-2 at 17]; *but cf. Thompson v. Sullivan*, 987 F.2d 1482, 1491 (10th Cir. 1993) ("The absence of evidence is not evidence. The ALJ's reliance on an omission effectively shifts the burden back to the claimant. It is not her burden, however, to prove she cannot work at any level lower than her past relevant work; it is the Secretary's burden to prove that she can."). On remand, if the ALJ believes Plaintiff's medical records are inconclusive, the ALJ should consider the need for a consultative examination to properly resolve Ms. Szymanski's disability claim, *see Hawkins v. Chater*, 113 F.3d 1162, 1166 (10th Cir. 1997), especially given the uncontradicted opinions of Drs. Moles and Buzan. Relatedly, to the extent the ALJ determines that Dr. Moles's or Dr. Buzan's treatment notes are inadequate, the ALJ must then re-contact these medical sources to clarify or supplement their notes. *See Maes v. Astrue*, 522 F.3d 1093, 1097-98 (10th Cir. 2008).

## CONCLUSION

For the reasons stated herein, the court hereby **REVERSES** the Commissioner's final decision and **REMANDS** this matter for further proceedings that are consistent with this Memorandum Opinion and Order.

DATED:  December 13, 2018

BY THE COURT:

Nina Y. Wang
United States Magistrate Judge